WILLIAM M. BUSEY, HENRY N. BANKARD AND ISAAC McCURLEY *vs.* WILLIAM J. HOOPER, JAS. S. HAGGERTY, A. P. BURT, and others.

*Corporation—Subscribers to the Capital Stock of an Incorporated company—Refusal to pay an Instalment on shares of Stock subscribed for—Application for an Injunction—Presumption in favor of the legal existence of an Incorporation—Effect of the Withdrawal of a Corporator from the Corporation—Effect of a mere Subscribing to the Stock of an Incorporated company.*

A bill alleged the incorporation of certain persons by the name of "The Citizens' Railway Co.," and that by the eighth section of the Act of incorporation, it was provided that the parties named in the Act should choose from their own number a President; and the remaining incorporators, or a majority of them, should act as a board of directors for the management of the affairs of the company until the first general meeting of the stockholders; it further alleged that a majority of the parties named in the Act accepted the same as required, and books of subscription to the capital stock were formerly opened, which contained an agreement by which it was agreed that the parties subscribing would take the number of shares opposite to their respective names; that the capital stock of the company should not be more than $300,000, and it should be divided into shares of $20 each; that as soon as two thousand shares should be subscribed, each subscriber would pay $5 per share, at the office of the treasurer. The bill further charged that the complainants subscribed collectively for eight thousand and fifteen shares, and had been ready and willing at all times to comply with their legal undertakings when lawfully required; that certain corporators declined to act as such, and only four remained; that one of the four refused to unite with the remaining persons, who, being but three in number, did not constitute a majority of the incorporators after the election of a president, and were therefore incompetent to perform the duties required of them; that notwithstanding such incompetency, they issued a call for the payment of $5 per share, and at the same time published a notice for the election of officers on a day named; and that the defendants pretending to be stockholders in the corporation proceeded to elect officers thereof; that said defendants had taken possession of the seal, books, &c., of the cor-

poration and kept them concealed; that by their agents they had begun to dig up the streets, and put down rails in accordance with the privileges granted by the Act of incorporation to the complainants and others, having a majority of the stock. The complainants further charged that they did not make any payment on account of the shares subscribed by them, because the person named as treasurer had not been legally elected, and because the parties who issued the call had no right to do so. The bill charged fraud and conspiracy, and prayed for an injunction, a discovery, and the appointment of a receiver. HELD:

1st. That the complainants, upon their own showing, were *mere* subscribers who refused to comply with the terms of their own subscription.

2d. That the complainants by subscribing to the shares of stock, promised not only to take the shares, but to pay for them in accordance with the terms and conditions of the subscription.

3d. That the complainants having failed to comply with the conditions and terms of their subscription to the capital stock of the railway company, without any default on the part of the corporation or its officers, had not such rights or interests in the stock as to entitle them to an injunction.

Where a corporation has gone into operation, and rights have been acquired under its charter, every presumption should be made in favor of its legal existence.

Where an Act of incorporation is accepted, and the company organized provisionally thereunder, no subsequent withdrawal of any of the corporators will effect its vitality.

The mere subscribing to the stock of an incorporated company, does not constitute the subscriber a stockholder, but puts it in his power to become such by compelling the corporation to give him the legal evidence of his being a stockholder, upon his complying with the terms of the subscription.

APPEAL from the Circuit Court of Baltimore City.

The bill in this case, filed by the appellants on the 24th day of March, 1871, states that certain parties were incorporated by the Act of 1870, ch. 438, by the name of "The Citizens' Railway Company," with power to lay and construct passenger railways in the city of Baltimore—that the capital stock was fixed at $300,000, divided into shares of

$20 each; that the affairs of said corporation were to be managed by a president and seven directors; that the parties named in the Act (eleven in number) should choose from their own number a president, and the remaining incorporators, or a majority of them, should act as a board of directors for the management of the affairs of the company until the first general meeting of the stockholders; that a majority of the parties in said Act named, signified their acceptance, and books of subscription to the capital stock were formally opened as required by section 8, and contained a certain agreement, to be found set out in full in the opinion of this Court. That Busey subscribed for 8,000 shares of the capital stock, Bankard 10 shares, and McCurley 5 shares, more than a majority of the whole number of shares; that they have been at all times willing and ready to comply with all their legal undertakings by reason of such subscription, whenever thereunto legally required; that all the parties named in said Act, except four, declined to act, and that the four so remaining acted as a board of directors; that Samuel Snowden, one of those remaining, refused to unite with the others; that said remaining incorporators, being but three in number, did not constitute a majority of the incorporators remaining after the election of president, and were incompetent by reason thereof to perform the duties required of them; that said remaining incorporators being but three in number, assuming to act as directors, did, on the 24th day of February, A. D. 1871, issue a call for the payment of $5 per share, and at the same time published a notice for the election of officers to take place on the 28*th day of March*, 1871; that the complainants did not make any payment on account of their subscriptions, because the person named as treasurer had not been legally and properly elected, and because the parties who issued said call had no right or authority so to do; that afterwards, to wit: on the 18*th day of March*, 1871, the defendants, pretending to be stockholders in said corporation, assembled in Raine's Hall, in the city of Baltimore, and then and there despite

of the notice already given to meet on another and a different day, and without any previous notice to the complainants, and with the intent of depriving them of their just rights as stockholders in said corporation, pretended to elect the defendants as officers of said corporation; that the defendants have taken possession of the books, seal, &c., of said corporation, and have begun to dig up the streets, and to put down rails in accordance with the privileges granted by said Act to the complainants and others, having a majority of the stock; and that the said defendants *have conspired and confederated* together for the purpose of *defrauding* the complainants out of their just rights as stockholders in said company, by privately and secretly meeting together *without notice* to the complainants, holding as they do, a majority of the stock of said company, and that said pretended election was a part of the contrivance and machinery with which the defendants designed to accomplish and perpetrate the said fraud.

The bill then prays for an injunction restraining the defendants from interfering or intermeddling in any way or manner with the concerns, business or affairs of the said Citizens' Railway Company, the appointment of a receiver, &c. An injunction was granted (GAREY J.) upon the filing of the bill. The defendants filed an answer. It admitted the Act of incorporation and its acceptance by a majority of those therein named; the organization of the company, and the opening of books of subscription, and the contract of the subscribers to pay $5 per share on the stock when called upon. It admitted the subscription of the 8,015 shares of the stock by complainants, but denied that they were ever able, willing or ready to comply with their obligations, or ever intended to comply when they subscribed; but alleged that their purpose was to speculate upon and embarrass the operations of the company; that Busey, who subscribed for 8,000 shares, was a young man without means, adequate to the fulfilment of his contract, and never designed or contemplated a compliance with his undertaking, unless he could sell out his sub-

scription at a profit, before being required to pay up an instalment on the stock; that at each and every meeting of the company, a majority of those who accepted the charter, were present and took part in the proceedings, and that Samuel Snowden acted as secretary at every such meeting; that notice for the call of $5 per share was duly published, and written notice delivered likewise to all the complainants; that the treasurer of the corporation was duly and legally elected, and gave bond in the penalty of $100,000. The respondents admitted that they did call a meeting of the incorporators at Raine's Hall, on the 18th of March, 1871, and while in session they received a communication addressed to them, signed by each and all of the subscribers to the stock of said company who had paid up·their instalments, and complied with their contract with the company, suggesting that the stockholders be called together at once to effect a permanent organization; they alleged that there was present at that meeting every single stockholder who had subscribed to the stock and paid up his instalment, and it was by the unanimous request of the stockholders in writing, that the time for the permanent organization of the company was changed from the 28th to the 18th of March. They stated that at a meeting of the incorporators a committee was appointed for the purpose of looking into the condition of the corporation, and with authority to make any contracts that they might deem judicious, for the commencement of the building of the road in pursuance of the provisions of the charter; that said committee entered into a contract on the 10th of February, 1871, with a certain John E. Eschbach, for the building of one mile of the road; that under said contract the said Eschbach had proceeded with his work, and laid the track and bed of said road in certain streets of the city of Baltimore, all of which it was claimed they had the right to do under their charter. The respondents denied that they had held any secret meetings, or that they had in any way confederated together to injure or defraud the complainants; on the contrary, the said

complainants had full knowledge of the time and place of each and every meeting of the company; that in utter disregard of their contract with the company and their responsibility in the premises, the complainants refused to pay the instalments on the stock subscribed by them. It was further alleged that Hagerty, one of the respondents, after the books of subscription had been opened, intending to subscribe for a large amount of the stock, for himself and others, was prevented from so doing by the subscription of the said Busey, which as believed by the respondents, was made and intended simply and only to embarrass the operations of the company; that feeling satisfied that Busey would not comply when called upon for his instalment, the said Hagerty agreed with the corporation to take 8,000 shares of the capital stock, in the event of Busey making default in his undertakings—that accordingly the said Hagerty subscribed for that number of shares with the understanding that he should have the right to claim the same, only upon default by Busey; that having given the complainants ample time, if they intended to comply with their undertakings, and being satisfied that they had no such purpose, (a fact admitted by them in their bill of complaint,) the corporation accepted the instalment of Hagerty on the stock subscribed by him, which he paid to the treasurer of the company by certified checks on the Franklin and the National Bank of Baltimore.

The answer also stated in response to interrogatories propounded in the bill of complaint, that the said Hagerty assigned and transferred a number of shares of the capital stock of said company to various persons; that he transferred to the respondent Hooper 500 shares, the said Hooper having previously subscribed for 25 shares of said stock.

Upon the filing of the answer a motion was made to dissolve the injunction, and the complainants asked for a commission to take testimony which was issued, executed and returned. The case was heard on the motion to dissolve, and on the 16th of May, 1871, the Court (PINKNEY, J.) passed an order dissolving the injunction.

From this order the complainants appealed.

The cause was argued before STEWART, BOWIE, BRENT, ALVEY and ROBINSON, J.

*Samuel Snowden* and *Orville Horwitz*, for the appellants.

By virtue of their subscription to the stock of the corporation, the complainants became the owners of the amount of stock subscribed for by them, and entitled to all the rights and privileges of stockholders; and such subscription made them members of the corporation, and entitled to vote at elections. *Spear vs. Crawford*, 14 *Wend.*, 20; *Lathrop vs. Kneeland*, 46 *Barb.*, 433; *Dayton vs. Borst*, 31 *N. Y.*, 435; *Smith vs. Grover*, 2 *Duvall*, (*Ky.*,) 17; *Chaffin vs. Cummings*, 37 *Maine*, 83; *Curry vs. Scott*, 54 *Penn.*, 270; *Miner, et al. vs. Mechanics' Bank*, 1 *Peters*, 46; *N. A. & S. R. R. Co. vs. McCormick*, 10 *Ind.*, 499; *Lexington, &c., R. R. vs. Staples*, 5 *Gray*, 520; *Donning vs. Potts*, 3 *Zabr.*, 66; *Van Dyke vs. Stout*, 4 *Halst. Chan.*, 333.

The subscription books for the shares of the Citizens' Railway Company were opened in May, 1870, and were continued opened for nearly one year, without there being any subscriptions except for a few shares, when on February 17th, 1871, the appellants subscribed for 8,015 shares of stock. They immediately then became entitled to that number of shares of stock, and according to the very terms of the agreement entitled to vote for the officers to be elected upon the permanent organization of the company—and consequently no election for officers could be valid unless the proper notice was given to them of the time and place of such elections. *State vs. Fergusson*, 31 *N. J.*, 130; *Abbott's Digest*, 457, *section* 12; *Angell & Ames on Corp.*, 393; *Grant on Corp.*, 80 *Law Lib.*, 213, (*top page.*)

The rights thus acquired by the appellants could not be forfeited by the corporation, even if a call had been *legally* made, because the charter does not authorize the forfeiture of

stock. *Angell & Ames on Corp., sec.* 356, *ch.* 10, *sec.* 5; *R. & B. R. R. vs. Thrall,* 35 *Vt.,* 536, (553;) *Long Island R. R. Case,* 19 *Wend.,* 37; *Ex parte Barton,* 28 *Law Jour. Chan.,* 637; *Nat. Pat. Steam Fuel Co.,* 5 *Jur., N. S.,* 420.

Nor could they be forfeited by non-compliance with the alleged call, because at the time when the said alleged call. was made, a majority of the *parties named* in said charter were not acting as a board of directors, and said call was therefore illegal. *Act of* 1870, *ch.* 438, *sec.* 8; *Angell & Ames on Corp. secs.* 501, 502, 508; *Blacket vs. Blizard,* 17 *Eng. C. L. R.,* 508.

And in an action for such instalments the corporation could not have recovered. *Price vs. The Grand Rapids, &c. R. R. Co.,* 13 *Ind.,* 58; *Cowley vs. The Grand Rapids, &c., R. R. Co.,* 13 *Ind.,* 61; *Hamilton vs. The Grand Rapids, &c., R. R. Co.,* 13 *Ind.,* 347.

The appellants did not ask a Court of Equity to compel a corporation to transfer to them certain shares of its stock, for of *these* they were already the lawful *owners,* but they asked it to prevent certain persons who without any right, had usurped the control of the corporation and were proceeding to exercise the franchises granted by the charter, without regarding the rights or interests of the stockholders in that corporation. In such a case can a Court of Equity refuse to interfere? Are not the claims of the appellants recommended by the dictates of conscience and the clearest principles of justice? *Md. Sav. Inst. vs. Schroeder,* 8 *G. & J.,* 93.

*Thomas M. Lanahan,* for the appellees.

The case disclosed upon the face of the bill is not such as to warrant the intervention of a Court of Equity, as the complainants can have full, adequate and complete remedy at law.

"A subscription for shares in the stock of a joint-stock incorporated company is a contract, and the interest acquired is sufficient consideration to support an action." *Angell & Ames on Corp., secs.* 517, 564.

"Chancery will not entertain a bill to try the validity of the election of corporate officers, who are *de facto* exercising corporate functions, especially where nothing appears to prevent seeking redress at law." *Abbott's Digest on Corp.*, p. 310, sec. 63; also *p.* 816, *sec.* 285; 27 *Penn. State Rep.*, 261, as to the measure of damages in such cases; *Perkins vs. Union Button Hole Company*, 12 *Allen*, 273; *Arnold vs. The Suffolk Bank*, 27 *Barb.*, 424; *Abbott's Digest on Corp.*, 765.

It is not sufficient to entitle a complainant to an injunction simply to assert that he will suffer "*irreparable damage*"—the "*irreparable damage*" must be set out in the bill. *Herr vs. Bierbower*, 3 *Md. Ch. Dec.*, 456; *Roman vs. Strauss*, 10 *Md.*, 89.

The bill in this case does not set out what injury the complainants are likely to suffer from the allegations set forth—but simply asks that the defendants may be restrained from exercising the rights and privileges acquired under the charter, without claiming those rights and privileges for any one else. The corporation is to be thus tied up, and all action interdicted by the injunction, which is made to accomplish indirectly the province of a "*scire facias* or *quo warranto.*" *Angell & Ames on Corp.*, sec. 410; *Gray vs. Portland Bank*, 3 *Mass.*, 364; *King vs. Bank of England*, 2 *Douglas*, 526; *Shipley vs. Mechanics' Bank*, 10 *Johnson*, 484; *Wilkinson vs. Providence Bank*, 3 *R. I.*, 22; *Bligh vs. Brent*, 2 *Young & Collier*, 268; *Hart vs. Froutins and Bolivia Gold Mining Co.*, 5 *Exchq. Rep.*, 111, *L. R.*; *Thorpe vs. Woodhull*, 1 *Sandf. Ch.*, 411.

Who constituted the corporation under section 7 of the charter? Only those who accepted the charter in the manner therein provided. *State, use of Wash. Co. vs. B. & O. R. R. Co.*, 12 *G. & J.*, 434; *Angell & Ames on Corp.*, secs. 81, &c. These six persons constituted the corporation, a majority of them had a right to make the call, and the same was in all respects legal. *Angell & Ames on Corp.*, secs. 500, 501, 502, 503; *Bank of Maryland vs. Ruff*, 7 *G. & J.*, 448; *Chase vs. Sycamore & Courtland R. R. Co.*, 38 *Ill.*, 215.

The complainants having confessedly refused to pay up their instalments on the call made upon them, the corporation had a clear right to treat their subscription as a nullity. *Perkins vs. Union Button Hole Co.,* 12 *Allen,* 273 ; *Abbott's Digest Law of Corp.,* pp. 798, 799, secs. 134, 135, 136, 137 ; *Klein vs. The Alton and Sangamon R. R. Co.,* 13 *Ill.,* 514 ; *Piscataqua Ferry Co. vs. Jones,* 39 *N. H.,* 491 ; *Angell & Ames on Corp.,* sec. 530.

What was the contract with the corporation, and in what did it differ from any other contract, that might be made, in reference to the bargain and sale of property ?   It bears upon its face the impress of being made by the complainants, not in "*good faith,*" as it is conclusively shown by their own testimony that they were not able to take the stock when they subscribed, and never intended to do so, unless they could speculate upon the company.   All the reasons set up by them in their bill for not taking it, and not paying their instalments have been abandoned by them in the testimony. *Angell & Ames on Corp.* sec. 146, *and note; Lewey's Island R. R. Co. vs. Bolton,* 48 *Maine,* 455 ; *Penobscott R. R. Co. vs. White,* 41 *Maine,* 512.

Whether the company had the right or not to make a change in the time of effecting a permanent organization, the complainants have no right to object.   *Angell & Ames on Corp., secs.* 491, 495 ; *Abbott's Digest Law of Corp.,* p. 458, sec. 26, and *p.* 459, sec. 33 ; *Jones vs. Milton and Rushville Turnp. Co.,* 7 *Ind.,* 547.

Every material allegation in the bill having been denied by the answer, and the proof in no way contradicting the answer, the injunction must be dissolved.   From the character of the testimony taken by the complainants in this case, it is now before the Court as though the hearing was upon the bill and answer, where all the allegations were denied by the answer.   The complainants cannot go outside of the allegations of their bill.   *Bouldin, et al. vs. Mayor, &c. of Balt., et al.,* 15 *Md.,* 20, 22 ; *Barroll's Chan. Prac.,* 310.

BOWIE, J., delivered the opinion of the Court.

Two prominent questions are presented by the record in this cause, either of which is decisive, without inquiring into all the minor and collateral issues raised in the briefs, viz:

1st. Had the complainants such adequate and complete remedy at law, as would deprive them of the aid of a Court of Equity?

2d. If the complainants have a right to equitable interposition, have they established their claim to the relief prayed for?

The jurisdiction of the Court depends upon the allegations of the bill. They furnish the facts (sometimes termed jurisdictional,) which determine whether the remedy is at law or in equity. They may show a case, for which there is an adequate and complete remedy at law; or such, as is only cognizable in equity; or cases of concurrent jurisdiction, in which the Courts of Equity interpose to restrain or prevent irremediable injuries, in aid of Courts of law.

The appellees (the defendants below,) insist that the bill in this cause belongs to the first class of cases: that the complainants have an adequate and complete remedy at law, by an action for damages, and therefore the injunction should be dissolved. The learned Judge who decided this case below has adopted this view, and referred to a number of cases as sustaining his conclusion.

It may be said of those cases generally that they were actions at law, in which the powers of a Court of Equity were not in question, and the specific remedy alluded to was a mandamus, which though a proceeding at law is sometimes compared to a bill in equity.

We will refer to a few of these cases by way of illustration. *Gray vs. The Portland Bank,* 3 *Mass. Rep.,* 364, was a special action on the case for damages accruing to the plaintiff, from the refusal of the defendants to deliver to him certificates for certain shares of stock.

SEWALL, J. said that in the case of the *"King vs. The Bank of England,"* (2 *Douglas*, 524,) it was decided that the Court will not grant a mandamus, because there is a remedy by an action on the case if they refuse ; which Lord MANS-FIELD said would lay for a complete satisfaction, equivalent to a specific relief. In the principal case then under consideration, a specific relief or restoration of the stock was not demanded by the action, and it was not (said the Court,) within the reach of the Court by any authority they could exercise.

In the matter of *Shipley* against the *Mechanics' Bank,* 10 *Johns.,* 484, the application was for a mandamus. The Court said " the applicants have an adequate remedy at law by a special action on the case, to recover the value of the stock, if the bank have unduly refused to transfer it. There is no need of the extraordinary remedy by mandamus in so ordinary a case. It might as well be required in every case where *trover* would lie. It is not a matter of public concern, as in the case of public records and documents, and there cannot be any necessity, or even desire of possessing the identical shares in question."

In the case of *The King vs. The Bank of England,* the Court said " they never grant a mandamus except for public purposes, and to compel the performance of public duties."

There is no parallel between a bill for an injunction and receiver as in the present case, and a petition for a mandamus ; the reasons for rejecting the one do not apply to the other. The case of *The Union Button Hole Co.,* 12 *Allen,* 273, was an action at law for damages for non-delivery of certain certificates of shares of stock, in which no question could be raised as to the authority of a Court of Equity, to protect by injunction vested rights. The bill in this case is not a bill for specific performance of a contract, or in the nature of an application for a mandamus; but, claiming to be stockholders in a corporation, the complainants charge *certain illegal, irregular, and fraudulent proceedings against*

*the defendants in violation of the charter, and pray for an in-junction, discovery and appointment of a receiver to protect their rights.*

The preventive power of a Court of Equity to be exercised by injunction, is recognised in numerous cases, as the appropriate remedy for such injuries.

In *Campbell & Voss vs. Ellicott, Poulteney & Co., 6 G. & J.,* 102, certain stockholders of the Union Bank of Maryland filed their bill in equity against other stockholders, charging that the latter, in violation of the charter, had caused a number of shares to be transferred without consideration to unknown persons, and had taken powers of attorney to vote their stock, thereby obtaining an undue and increased vote in the election of directors, and prayed an injunction.

It was objected, the remedy was by mandamus or *quo warranto.* After full argument, the Court (by BUCHANAN, C. J.) declared the matter of the bill furnished a sufficient ground for the interposition of a Court of Equity. The facts stated (it was said,) are in violation of the charter, and if carried into effect would be a practical fraud upon the appellants, and in derogation of their chartered rights, for the protection of which an injunction was the proper remedy.

To the same effect, *Angel and Ames on Corporations, p.* 396, (*note* 2); 6 *Allen,* (*Mass. Rep.,*) 52; 40 *N. H. Rep.,* 549. Assuming that the bill is not objectionable on the ground that the complainants have an adequate and complete remedy at law, let us inquire whether they have alleged or proved such a title or interest in the stock of the Citizens' Railway Company, as entitles them to be treated as stockholders, and to invoke the aid of a Court of Equity to protect their rights by injunction, etc.

Without recapitulating all the allegations of the bill, it is sufficient for this purpose to state that after setting out a copy of the Act of incorporation of " The Citizens' Railway Company," in which as is alleged, it is provided by the eighth section, " that the parties in said Act named should choose

from their own number a president, and the remaining incorporators, or a majority of them should act as a board of directors for the management of the affairs of the Company, until the first general meeting of the stockholders," it is charged that a majority of the parties in said Act named, accepted the same as required, and books of subscription to the capital stock were formally opened as required by section eight of said Act, and contained the following agreement:

" We, the undersigned, agree to subscribe for, and hereby do take the number of shares opposite to our respective names, in the Citizens' Railway Company; the capital stock of the company shall not be more than three hundred thousand dollars, and it shall be divided into shares of twenty dollars each. As soon as two thousand shares have been subscribed, we severally promise to pay five dollars per share for each and every share subscribed by us, at the office of the treasurer, A. P. Burt, No. 30 Second street, when receipts will be given signed by the treasurer and countersigned by the president. The remaining instalments shall be called for as the board of directors may find necessary for building, equipping and running the road. Each shareholder shall be entitled to one vote, either in person or by proxy, for each share of stock held; but every number of shares equal to one-tenth of the whole number subscribed shall be entitled to elect one trustee, and to that end, at the first ballot for trustees, no member shall vote for more than one trustee, and every person receiving the one-tenth of the votes cast shall be a trustee. At the second or other ballots, those receiving the highest number of votes cast shall be trustees to fill the vacancies if any remain after the first ballot; but any shareholder holding more than one-tenth of the shares, may vote at the first ballot for as many trustees as he has tenths of the whole number of shares."

"J. S. HAGERTY, *President.*
A. P. BURT, *Treasurer.*"

The complainants charge they subscribed collectively for 8,015 shares of stock, more than a majority of the whole number of shares, as appears by a copy of the aforesaid agreement, and signatures therewith filed.

On reference to this Exhibit, it appears that W. M. Busey subscribed for 8,000 shares on the 17th February, 1871; the subscriptions of Bankard and McCurley, have no date; but Bankard is immediately before, and McCurley's immediately after Busey's.

They further charge that they have at all times been ready and willing to comply with all their legal undertakings, whenever thereunto legally required.

That certain corporators therein named, declined and refused to act as such corporators, and there only remained Hooper, Richardson, Burt and Snowden, to perform the duties of corporators, and as a board of directors under the provisions of section eighth of said Act: that Snowden refused to act with the remaining persons, who being but three in number, did not constitute a majority of the corporators, after the election of a president, and were incompetent by reason thereof, to perform the duties required of them. That notwithstanding the above, the three remaining corporators did, on the 24th of February, 1871, issue a call for the payment of five dollars per share, and at the same time publish a notice for the election of officers on the 28th of March, 1871.

The complainants further charge they did not make any payment, *because the person named as treasurer had not been legally elected, and because the parties who issued the call had no right to do so.* It thus appears from the bill, the complainants were *mere* subscribers, who refused to comply with the terms of their own subscription, upon grounds which they allege either suspended or invalidated the contract.

According to their own showing, the corporation had been previously organized under the provisions of section eighth. Books of subscription had been regularly opened; terms of subscription prescribed and signed on the part of the president

and treasurer, and these terms subscribed by the complainants, thus recognizing the authority of the officers; yet repudiating these terms and disregarding the condition precedent, they claim the benefit of a contract which they have wholly violated.

Where a corporation has gone into operation, and rights have been acquired under its charter, every presumption should be made in favor of its legal existence. *Hagerstown Turnpike Co. vs. Creager,* 5 *H. & J.,* 125.

If the Act of incorporation was accepted, and the company organized provisionally under the charter, no subsequent withdrawal of any of the corporators would effect its vitality. But the answer denies that there was any such reduction in the number of the corporators, and at this stage of the proceedings we assume the answers to be true when uncontradicted by the evidence. The contract of subscription was between the corporation on the one hand, and the subscribers on the other; it is not competent for one of the contracting parties, under such circumstances, to question the regularity of its organization, or the authority of its officers.

Having refused to pay the instalment, (which became due according to the terms of the subscription,) as soon as two thousand shares were subscribed; an event which occurred simultaneously with the subscription of the eight thousand shares by the complainant Busey, and of which no notice was required, being due by the terms of the contract, it remains to inquire what right, if any, was acquired by their subscription. In the language of the authorities, "the promise of the complainants, the subscribers, to take the shares subscribed by them respectively, when taken in connection with what precedes and with the Act of incorporation, is a promise not only to take the shares, but to *pay* for them; to take them on the terms and conditions set forth in the subscription paper." *Angell & Ames on Corp.,* sec. 519; *Spear vs. Crawford,* 14 *Wend.,* 20.

The law is now considered as settled, that the obligation of actual payment is created in all cases by a subscription to a

capital stock, unless the terms of the subscription are such as plainly to exclude it.  *Palmer vs. Lawrence, 3 Sandford Rep.,* 161; *Elysville vs. Okisko Co., 5 Md.,* 152, and cases cited in *Angell & Ames on Corp.,* 492, *note 2d.*

None of the cases decide that the mere fact of subscribing to the stock of an incorporated company, constitutes the subscriber a stockholder, but that such subscription puts it in his power to become a stockholder, by compelling the corporation to give him the legal evidence of his being a stockholder, upon his complying with the terms of the subscription. *Spear vs. Crawford, 14 Wend.,* 24.

The terms of the subscription in the present case so far from excluding, expressly require the payment of $5 per share, as soon as two thousand shares shall have been subscribed, as preliminary to the qualification of stockholders, who were to elect the permanent president and directors of the company.  This payment was a condition precedent, without which there could have been no permanent organization. Upon payment of that instalment of $5 per share, receipts were to be given signed by the treasurer and countersigned by the president.

" The remaining instalments (says the agreement) shall be called for as the board of directors may find necessary for building, equipping and running the road."

The appellants, (the complainants below,) having failed to comply with the conditions and terms of their subscription to the capital stock of The Citizens' Railway Company, without any default on the part of the corporation or their officers, have not such rights or interests in the stock as to entitle them to the continuance of the injunction.

The order dissolving the injunction is affirmed.

*Order affirmed.*

(Decided 10th January, 1872.)